UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 1:11-cr-448  LJO |
| Plaintiff, ) | |
| ) | SENTENCE |
| vs. ) | |
| ) | |
| MICHAEL TORRES, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Fresno, California                    Monday, April 29, 2013


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Government:        **MELANIE ALSWORTH**
                          Assistant U.S. Attorney
                          2500 Tulare Street, Rm. 4401
                          Fresno, California  93721

For the Defendant:        FEDERAL DEFENDER'S OFFICE
                          2300 Tulare Street
                          Suite 330
                          Fresno, CA  93721
                          BY:  **JEREMY S. KROGER**
                               Assistant Federal Defender

1  Monday, April 29, 2013                    Fresno, California

2  10:29 a.m.

3          THE COURT:  Call number 11 on calendar, Michael

4  Torres, Action Number 448.

5          MR. KROGER:  Jeremy Kroger on behalf of Michael

6  Torres, who is present in court.  He is in custody, your

7  Honor.

8          MS. ALSWORTH:  Melanie Alsworth on behalf of the

9  United States.

10          THE COURT:  All right.  Sir, what is your name?

11          THE DEFENDANT:  Michael Torres.

12          THE COURT:  Mr. Torres, have you had a chance to

13  review the Presentence Report with your counsel?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Do you have any questions that remain?

16          THE DEFENDANT:  No, your Honor.

17          THE COURT:  The Court has received and reviewed the

18  30-page Presentence Report of March 12, which was revised on

19  April 15; also the 11(c) agreement; the report from

20  psychologist; the sentencing memorandum, including the DVD,

21  with oral testimony; the e-mail regarding like cases; the

22  numerous letters, which I believe totaled 47, and the -- and

23  that's exclusive of the defendant's letter.

24          I note that the report indicates the offense level to

25  be 34.  History Category is I.  The guideline ranges on Counts

1, 2, 4 and 5, if the offense level is correct, is 151 to 188.

And on Count 6, that is a nonnegotiable mandatory 84-month

consecutive sentence.

     The Court has considered the numerous 3553(a)

factors, and there are numerous factors.

     With regard to my review of the sentencing -- defense

sentencing memorandum, even though it appears as though there

were plea bargain discussions, and I think agreements, that

the offense level was 31, it appears as though there was -- it

was incorrect.

     It was an incorrect analysis, because one was the

issue of showing a weapon versus using the weapon.  That would

have still only been a one-level difference, so that would

have brought the level down to 33, if it had been just a

showing only.

     But there was a bigger issue on the multiple count

adjustment that was not correctly figured, and that, I think,

is the biggest issue.

     Now, that said, I think, based on my review of this,

that the offense level in the Presentence Report is correct.

The real issue here is not that.  The real issue is the

variance under 3553(a), which I think is what your issue is,

rather than whether or not the offense level is correct.

     I do have a few questions.  I can hold them or I can

ask them first.

1         MR. KROGER:  Why don't I address the Court's

2    questions, and I will point out that many of Mr. Torres'

3    friends and family are here.  His family has addressed the

4    Court by the video.

5         I know that there is one individual who wants to

6    speak on behalf of the community that Mr. Torres was such a

7    part of, and I don't know when the Court wants to hear from

8    that.

9         THE COURT:  Right now.

10        MR. AGUIRRE:  Good morning.

11        THE COURT:  Can you tell us who you are, please.

12        MR. AGUIRRE:  My name is Samuel Aguirre,

13   A-g-u-i-r-r-e.

14        THE COURT:  Go ahead.

15        MR. AGUIRRE:  Okay.  Thank you for this opportunity

16   today to speak before the Court.  Today, I speak on behalf of

17   friends and family in the community which I reside, Modesto,

18   California.

19        I have known Michael for 18 years.  I met him as a

20   young man growing up in church, and we have become best

21   friends throughout the years.

22        Michael's actions have definitely left us

23   disappointed, confused and, at times, very angry.  Michael's

24   mental health diagnosis has shed some light on the situation,

25   and we are pleased that he is being treated.

1          I have personally been in contact with Michael

2    through letters and phone conversations, and I can honestly

3    say that I have noticed a change in Michael in his mental

4    stability, his personality a little bit, and I feel that he is

5    on a good track.

6          THE COURT:  Could I interrupt?  Change from what to

7    what?  When to when?

8          MR. AGUIRRE:  From probably the past five years that,

9    you know, as far as before he was a little bit -- I have

10   noticed signs of depression because of the illness of his

11   mother, suffering from cancer.  The status of his marital

12   situation wasn't on the right track.

13          But his behavior as far as, you know, being a little

14   bit, you know, it wasn't real -- you know, I'm not a doctor or

15   anything like that, or a mental psychiatrist or anything like

16   that, but, you know, I just noticed since I have talked to him

17   on conversations and letters, that he just seems that he is

18   more -- you know, less confused, I would say, or less -- he

19   has his thoughts together.

20          He is not on one subject or another.  He is kind of

21   just focused on what we are talking to or the conversation at

22   hand.

23          THE COURT:  Okay.

24          MR. AGUIRRE:  But one thing that surprised me about

25   Michael is his positive attitude when I talked to him on the

1   phone and his questions about how I'm doing and how my family
2   is doing.

3          And that kind of reminded me of when we were growing
4   up, about how Michael, he always cared about other people.  It
5   wasn't about him or what he was doing in life.  It was really
6   about how you are doing, how other people are doing, and how
7   is everything going.  And I was glad to see that and hear that
8   from Michael in our conversations.

9          I think, you know, in his situation, I think Michael
10  could easily maybe blame his mental diagnosis.  He could
11  probably even blame his -- the toll that he has gone through
12  of the death of his mother and the sickness of his mother,
13  suffering through cancer.

14         And I have been through similar situations.  And he
15  could probably use that as an excuse for his behavior and his
16  actions, but I have never heard him use that as an excuse for
17  his behavior.  He knows what he has done and he is very
18  remorseful for what he has done, and I believe he has looked
19  at himself in the mirror and he is ready to pay his debt to
20  society for his actions.

21         One thing me and Michael have in common is we both
22  have two beautiful daughters.  I have two beautiful daughters.
23  He does as well.

24         And one thing I have admired about Michael is the way
25  he is a father to his children.  I know his actions haven't

1   shown that for what he has done, but regardless of that, he

2   has always been a good father.  He has always been there with

3   his children.  He always brings them along, no matter if it is

4   a fishing trip or going out to lunch or whatever it may be, I

5   have admired that about Michael.  And I've learned a lot from

6   him as a father, and it has made me a better father, I

7   believe.

8         But through his actions, he has lost a lot of things.

9   You know, he doesn't have much anymore, but he does have a few

10   things.  He does have -- he will always be a father to those

11   girls.  No one can take that away from him.  He will be a dad

12   until the day he dies.

13         And he also has hope.  He has hope that one day that

14   he will be able to be there for his children again, be that

15   father that he was and that he can be.

16         And that he, you know, and -- you know, he has that

17   hope that one day he will see them walk across the stage at a

18   graduation or give his daughter away, walk her down the aisle,

19   as a father should.

20         And I believe that hope, Michael can live on and get

21   on the right road and be on that path to be a better person

22   and a benefit to society.  And I believe that Michael is

23   capable of that because of what he is -- because of the person

24   he is.

25         So you probably hear it a lot that, you know, when

1   someone comes up here and talks about a friend or someone

2   that's here in his same situation, that you may have to dig

3   deep down inside, that this person is a good man.

4           And I can't say that about Michael.  You don't need

5   to dig deep.  You just scratch the surface, you get to know

6   him a minute, you can tell that he has a good heart and he is

7   a good man.  And he has good intentions.

8           He loves people.  And that's why you see the people

9   here today.  That's why you've received a lot of letters on

10  his behalf, because people love him and he loves them.

11          So thank you for the opportunity to talk today.  I

12  appreciate it.

13          THE COURT:  All right.  I know that it is not easy to

14  come up and talk under these circumstances, so I appreciate

15  it.

16          MR. KROGER:  Should I address the Court's questions

17  first?

18          THE COURT:  It is up to you.  If you want to address

19  based on what you have to say or if you want me to ask the

20  questions that are in my mind, I will.

21          MR. KROGER:  I wanted to say a few words, and I know

22  that Michael also wants to address the Court.  I won't say too

23  much because I think a lot of what needs to be said in this

24  case has been said, frankly, better than I can say it in the

25  letters I have given to the Court and the statements from his

1  family.

2         I will say this.  I think that there is an extremely,

3  extremely low chance of recidivism in this case.  I think

4  there is a number of reasons for that.  One is the mental

5  health issues at play here, if not the sole reason for this, I

6  think were a necessary factor in him committing these

7  offenses.

8         And he is receiving treatment now.  And I have spoken

9  to him in depth about the changes that he has felt in his

10 mood, in his just mental approach to life since he started

11 taking medication.  And it's been eye opening to him.  And

12 he -- it is one of the silver linings, I think, in this case,

13 is that he is now receiving the treatment that I think he has

14 needed for sometime.

15        The other issue is that he is extremely, extremely

16 remorseful.  And I think that comes through best of all not

17 just in his letter, but in the letters that were submitted to

18 the Court, where letter after letter, talks about the

19 conversations that they have had with him.

20        On the outside, after he was initially arrested and

21 released on bond in the state case, and then the people who

22 have exchanged correspondence with him or met with him and

23 come to visit him at jail in Lerdo, he is extremely

24 remorseful.  And not just for being caught, but for the

25 actions that he committed himself.

1          And I think that he has done what we expect from

2     someone who is remorseful, and he is taking affirmative

3     actions to make sure this doesn't happen again.

4          He has taken a plethora of classes since he has been

5     in custody, including GED classes, classes on parenting,

6     classes on domestic violence, classes on -- he is going to

7     church constantly.  He is studying the Bible.

8          He has also requested and ordered books to help him

9     avoid finding himself in this situation again.  He is taking

10    substance abuse classes.

11         He is not just remorseful, but he is taking the steps

12    that one needs to take to make sure that he doesn't find

13    himself in this situation again.

14         The other thing I want to address is that I think one

15    factor that is very much at play here that will prevent him

16    from ever doing something like this again is the support that

17    he has with friends and family.

18         And I recognize that that support was there

19    previously, but I think something significant has changed.

20    One of the letters to the Court I thought said this very

21    eloquently, and I forget the individual who wrote it, but it

22    was from one of the ministers who wrote to the Court.

23         And what he said is that, speaking as a minister, he

24    finds himself in this situation where people are constantly

25    coming to him for help, for support, and people don't think

1  that someone in that position of leadership them self needs

2  help and support.

3       And I think that everybody in this courtroom, when

4  Michael is released, will be there for him and will be

5  proactively looking to support him.

6       I know people have offered in their letters, offers

7  of employment to Michael.  And everyone here, I know, will be

8  there.

9       I have never had a case where this many folks have

10 shown up in my years before the Court.  And I also know that

11 Michael himself has learned to turn to these folks.  Through

12 my conversations with him, I know that he is much closer with

13 his father than he has been before.

14      And I think one of the issues that has prevented him

15 in the past from turning to folks for help is the sense of

16 pride that he had in being viewed by his community as this

17 leader, as somebody who doesn't need help.

18      And, you know, you spend a little bit of time in

19 federal prison, and that sense is gone.  You don't have to put

20 on a front anymore.  And he recognizes that as well.

21      So I think the chances of recidivism here are

22 extremely low.

23      The other point I will make to the Court is often I'm

24 coming before the Court and saying my client deserves a break

25 because he has done the things in life, at least recently,

1   that he should do, he has discharged a previous parole or made

2   his child support payments.

3        It is a rare situation where I can come before the

4   Court and say my client is a genuinely good person and this

5   action doesn't really define him.

6        When I looked at the decision that Michael made as a

7   young man to devote his life to the ministry and to go out and

8   help others, I mean I think that's reflective of him.  And his

9   decision to leave the ministry, I think, was in large part due

10  to another obligation that he felt was stronger than that, and

11  that was to his marriage.

12       He has gone out in the streets and fed homeless

13  people.  He has gone into prisons and worked with inmates

14  there.

15       Since he has been incarcerated, he has worked with

16  inmates.  He, step after step -- and it is reflected in the

17  letters -- he has done wonderful things throughout his life in

18  a way that I'm not used to seeing, in a way that, frankly, is

19  humbling to me.

20       And just sort of as an anecdote, just his everyday

21  interactions with folks, I went to visit him at the Lerdo jail

22  the other day, and after the CO took him away and came back to

23  get me to lead me out, he says to me, unprompted, "This is the

24  nicest inmate I had ever had in my time here," and I think

25  that is reflective of how people react when they have

1  interactions with Michael.

2         The last point I will make, your Honor, before

3  addressing the Court's questions, is that the requested

4  sentence, the ten years that I request in my memorandum, it is

5  not a slap on the wrist, by any means.

6         It is a long time.  And it is particularly a long

7  time, I think, for someone like Michael Torres, but a decade

8  is a long time, I think, to anybody.

9         And I'm not asking the Court to let him off lightly

10 by any stretch.  I do think that the request is reflective of

11 the seriousness of the offense.

12        And with that, if the Court has any questions, I'm

13 happy to address it.

14        THE COURT:  I will wait until he addresses the Court.

15        THE DEFENDANT:  Thank you, your Honor.  First, I want

16 to apologize to the banks.  And I promise them that I would do

17 everything I can to pay them back, every red cent.  And to the

18 customers and employees that were there, I am sorry, and I

19 apologize for the pain it caused and the experience that they

20 went through because of my stupidity.

21        To my family, my beautiful little girls, I'm so sorry

22 for what I have done.  And I want to do everything I can, the

23 very first opportunity I can, to be with them.  I will be back

24 in their lives, and I'm sorry for the cause of the pain that I

25 have caused them and the shame.

1       And to my wife, I apologize for failing you as a

2   friend, companion and provider, and hopefully someday, you

3   will be able to forgive me.

4       And then to my dad and my brother, Dad, I'm sorry

5   that I caused a black mark on your name.  And, Tim, I'm so

6   sorry that I'm not there for you during your happy years of

7   the beginning of your marriage, but I promise that I will be

8   back and I will redeem myself.

9       To my family, even though technically, you are my

10  friends, but really we know that you are my family, I'm sorry,

11  and I love every one of you.  I promise I will redeem myself.

12      I'm an idiot, your Honor.  And I'm going to do my

13  best to make sure that this never happens again.  The cause

14  and the loss of pain and the shame and suffering that I have

15  caused on everybody, I'm going to do everything in my power

16  not to let this happen again.

17      And I have, I told you in my letter, that I have been

18  taking, reading up on CBT, and bipolar.  I have been taking my

19  medication.

20      But also, I have been fully acknowledging my alcohol

21  abuse.  And in Modesto, I took Breaking Barriers.  In Fresno,

22  I took AA.  And then there were a few classes in Lerdo, I

23  think they closed it because I was the only one going to it,

24  but I was going to it.

25      And I totally acknowledged that I was using it as an

1   anodyne to my shame and depression and disgust at who I was

2   becoming and became.

3           And also, I was slowly watching my mom deteriorate.

4   And so I was self-medicating, and it was a devastating way to

5   do it.  And instead of being the balm that I needed, it just

6   added fuel to the fire and added to my failure.

7           But I do mean this with all my heart, that I'm going

8   to be the best man that I could be for my children, and that

9   someday they will be able to be proud of me instead of

10  ashamed.

11          And that it is my mission statement, I made it a

12  mission statement of mine, that they will be -- I would be a

13  man and a father that they would be proud of, and that when my

14  name is heard, that they would smile because of it.  That's my

15  mission statement.

16          And I'm going to do everything I can.  I'm going to

17  do everything I can.  I refuse, in fact, to allow the failure

18  that I have been as a man to cause me to be a failure as a

19  father.  And that I will arise, and rise up from the ashes of

20  this epic failure of mine and be the man that God wants me to

21  be and the man my society and family needs me to be.

22          And again, I am sorry.

23          THE COURT:  Do you know why you did this?

24          THE DEFENDANT:  Your Honor, I have thought about this

25  quite a bit, in fact, and yes.

1          THE COURT:  Why did you do this?

2          THE DEFENDANT:  You know, first of all, I want to be

3    very clear that I'm not trying to say these things as an

4    excuse for what I have done.  I was wrong.

5          THE COURT:  I'm asking you for the truth, whatever

6    that truth is.  Why did you do this?

7          THE DEFENDANT:  Yes, sir.  It is not just one thing.

8    You know how like we have like tsunamis because of an

9    earthquake.  But I think it was more of the destruction I did

10   was more like a hurricane where I was sick and tired of my

11   failures.

12         I kept failing after failing.  And it wasn't because

13   I was lazy.  I worked many jobs, seven days a week, 12-hour

14   shifts, but I kept losing the jobs that I had.  And then I

15   kept getting in financial bind after financial bind.

16         And I literally kept failing, failing, failing, and I

17   got to the point where I believed that part of it was that my

18   pride blinded my eyes, blinded my decisionmaking.  I really

19   believe that that caused, it was like -- that was the major

20   cause of the effect.

21         And then, of course, I was depressed.  And I was

22   trying, I was trying -- I wanted to keep my family together,

23   and I felt like if I lost my house, I would lose my wife.  And

24   if I lost my wife, I would lose my kids.

25         And it was -- and I didn't want to lose any of that.

1   And I was losing my mom at the same time, but, again, I'm not

2   using these as an excuse, but I feel like it was those

3   thermals, if you will, of the hurricane that kept adding the

4   different storms together that created this, and that's what I

5   came to.

6          THE COURT:  Where is the money?

7          THE DEFENDANT:  All of it was spent.

8          THE COURT:  On what?

9          THE DEFENDANT:  On getting me out of debt, on trying

10   to keep my house.  And I was giving it out to my family and

11   friends and my mom.

12          I was trying to do it in a way that it wouldn't like

13   where in the world are you getting all this money from, but I

14   was constantly be giving them a hundred here, couple hundred

15   there, and it added up.  It was quite a bit of money.

16          And I wasn't dressing nice.  My Explorer is a '95.  I

17   wasn't driving around in a nice car.  It was all literally

18   going right back out to my family and my house.

19          MS. ALSWORTH:  I'm not sure exactly where to begin,

20   your Honor.

21          THE COURT:  That's how I felt this morning at 3:30

22   when I was going through this case.  And I will just tell you

23   bluntly, very few cases in the almost 24 years I have been a

24   judge, very few cases keep me awake at night.  This one did.

25          MS. ALSWORTH:  I agree.  I believe that there is much

1   truth to what Mr. Torres has told the Court this morning.  I

2   think that he has had much opportunity to think about the

3   actions that he has engaged in, the effects that this has had

4   on people in the community, the people in his own community,

5   not to mention the victims that were involved in these cases.

6        The government does stand by the recommended sentence

7   in the plea agreement.  I believe 16 years in this case is

8   appropriate.  And that there should be a variance from the

9   guideline calculation, as determined by the Probation Office.

10       I don't, however, believe that a downward departure

11  should be granted under 5H1.3.  I did have an opportunity to

12  review the information in the letter that Mr. Torres

13  submitted.

14       And while he may suffer from mental or emotional

15  conditions, when I consider this case from a common sense

16  perspective, it seems to me that Mr. Torres is very capable of

17  conforming his actions.  He knows what he did was wrong.  He

18  knows now why he did that.  And I presume that at the time, he

19  knew why he was doing that.

20       He admitted that he was having financial difficulty.

21  That is much reflected in the evidence that would have been

22  presented in this case.

23       To his credit, he admitted that he was trying to make

24  his mortgage payments, and that is also reflected in the

25  evidence that would have been presented in this case.

1        He had no juvenile adjudications.  And the letter

2    that was submitted to the Court indicated that he suffered

3    from PTSD and some instances that occurred as a child.

4        He has one felony conviction as an adult, in 2000.

5    And it appears that that was in fact expunged about four years

6    later after he successfully complied with the terms of his

7    probation.

8        So I don't think that a downward departure should be

9    granted in this case based on that condition.  As far as a

10   variance is concerned, I believe to get to the 16-year

11   sentence, which the government thinks is appropriate in this

12   case, the Court should consider other sentences that have been

13   granted or imposed on defendants in similar cases.

14       16 years seems to be an appropriate sentence.  I

15   think it is just punishment for the acts that he has

16   committed.  Four crimes of violence, where he is brandishing a

17   firearm.

18       We don't have any victims here today to talk about

19   the effects that it has had on him, but the ramifications are

20   huge.  This type of behavior affects people long term.  It

21   causes them to rethink the types of jobs that they engage in

22   and whether or not they can continue working as cashiers in a

23   bank.

24       And also I would add that these weren't crimes that

25   occurred in a short period of time.  It wasn't like he was

1   engaging in some type of criminal spree.  These bank robberies

2   were three, four, five months apart, each one of them.

3        When Mr. Torres had a particular need for money, he

4   would go out and rob a bank.  That was his solution.

5        And I think 16 years in this case would send a

6   message that this type of behavior does need to be punished,

7   it does need to be punished in a way that is just and fair.

8        I believe that's it, your Honor.

9        THE COURT:  Anything else?

10        MR. KROGER:  Not unless the Court has any questions,

11   your Honor.

12        THE COURT:  I don't.  I will tell you that it is rare

13   when a person comes before me that the vast majority of their

14   life has been a good one.  Usually, it is it hasn't been, and

15   there has been a very long record and string of events of

16   misconduct or out and out criminal behavior, and defense

17   counsel; in other words, the attorney representing this

18   person, is ordinarily trying to find something, as your

19   attorney mentioned earlier, find something good that can

20   perhaps balance out some of this awful bad.

21        I have the flip side with you, which is one of the

22   problems with the case.  Is that in your case, it is very easy

23   to find all of the benefits that you have brought other people

24   through most of your life.  You have spent most of your life

25   trying to benefit the community, trying to help people.

1          And this -- this -- these crimes are, frankly, out of

2     character for all the rest of your life.

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  And one of the things that makes this

5     such a dramatic and difficult case for me is that it is rare

6     when we are going down the super highway of life, and we have

7     somebody going 70 miles an hour, who, in the middle of the

8     freeway, makes a 90-degree right turn or left turn off the

9     highway.

10          Usually, it is people merging off the highway, and

11    you can see exactly what their path is, and you can see that

12    it happens almost in a gradual, predictable manner, where

13    after they start going off the highway of life, which I

14    consider to be following the law, you can predict what is

15    going to happen next and next and next, and what a surprise

16    that's where we are usually at sentencing.

17          Here we aren't there at all.  You didn't make a

18    90-degree turn.  You made a U-turn and went back against

19    traffic in a suicidal head-on collision course with everything

20    that you had done before.  That makes no sense.

21          That's exactly what prompted my question to you, the

22    first of two, and that was:  Why did you do this?  This makes

23    no sense.

24          THE DEFENDANT:  Yes.

25          THE COURT:  Generally, when something makes no sense

1    to me, after all of these years of doing what I'm doing, it's

2    generally one of two things, mental illness or drugs/alcohol.

3    Alcohol is a drug.  Drugs.

4            THE DEFENDANT:  Yes.

5            THE COURT:  You've got both.

6            THE DEFENDANT:  Yes.

7            THE COURT:  I must tell you that because of that, it

8    makes it a little bit easier for me to at least understand

9    what has happened here.

10           I certainly do understand what your attorney said

11   about the problem that ministers, priests, rabbis have when

12   they have huge problems.  And they do; they are like everybody

13   else, because I will just tell you on a personal level, judges

14   are the same way.

15           People look at judges and ministers and priests and

16   rabbis and, in many cases, physicians, in the same manner of,

17   "You should have it all together.  You should not have

18   problems.  If you have problems, you should be able to take

19   care of those problems."

20           And as a result of that, most people live up to or

21   live down to expectations that others have of them, and as a

22   result of that, they do not get the help they need when they

23   need it.

24           That, in and of itself, is an additional failing.

25   That is a sign of weakness, the same weakness that those

1    groups of people explain to themselves, they don't want that

2    weakness to be shown.  It is actually the absolute opposite.

3    And you fell into that trap.  And it was a trap, a human trap

4    the size of the Grand Canyon.  You needed help.

5            THE DEFENDANT:  Yes.

6            THE COURT:  You apparently finally got it.  And with

7    regard to your mission on a religious level, maybe you not

8    only needed the help, you needed a new mission which you are

9    now going to have.

10           THE DEFENDANT:  Yes.

11           THE COURT:  I'm not the one who makes those religious

12   or faith-type decisions, but that is certainly a possibility,

13   and I mention it for only one reason, and that is because when

14   we sentence people, especially to long sentences, which no

15   matter which side of the argument I accept here, it is going

16   to be a long sentence --

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  -- people who have long sentences need

19   hope to keep moving.  It is a human need.  Hope is a human

20   need.  And you ought to have it.

21           I will tell you that when I see this many people come

22   to a sentence, almost in every single other case, they have

23   been victims.  And it is very unusual for the victims of the

24   crime not to be here.

25           Now, that said, these are victims of your crime.

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  There are such a thing as collateral

3   victims.  You had direct victims, there is no question about

4   it.  I can tell you if I or a family member of mine had been

5   in the bank where you pulled a gun -- and I am obligated, by

6   the way, whether those people are sitting in this courtroom or

7   not, to view this case from their standpoint as well -- I can

8   tell you under those circumstances, I would certainly not be

9   happy with you.

10        THE DEFENDANT:  Yes, sir.

11        THE COURT:  These days, when people have guns and

12   shoot indiscriminately and hurt and maim and kill people for

13   no reason, as evidenced by the most recent, the Boston

14   incident, you ask why?  Things do happen where people who do

15   irrational things have irrational results that are

16   catastrophic.  And that certainly could have been you.

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  And by -- it certainly wasn't the grace

19   of the Court or the legal system that spared you and them from

20   some worse act than already was done.  You could have shot

21   somebody easily.

22        So there are reasons to have hope in your situation,

23   and your lawyer has outlined a number of them.

24        Now, I have tried, as the United States attorney was

25   talking, to pick at her as far as what she was saying.  There

1    is nothing to pick at.  She is completely true --

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  -- and honest in what she said.  She

4    didn't exaggerate.  Everything she said was true.

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  So the reason that I'm going through all

7    of these things is going back and forth, back and forth.  We

8    have got victims on one side.  We have got your life on

9    another.

10             And we are weighing and balancing constantly, which

11   is why the United States Constitution gives judges so much

12   discretion.  Otherwise, we would just simply plug all this

13   into a computer, let it spit at us and spit out the result,

14   and walk away.  And some days, I will admit, like today, I

15   almost wish that that's what could happen.

16             But it is not to happen that way, and judges accept

17   their jobs as they are and their duties and obligations as

18   they are and the oath that we take as being important and

19   true.  And that's exactly what I'm going to do today.

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  I'm not going to give you what you want.

22   I'm not going to give the government what they want.  Although

23   again, I will say, both sides of the arguments have a great

24   deal of merit.

25             THE DEFENDANT:  Yes, sir.

1          THE COURT:  Oftentimes, I can look at Mr. Kroger or

2     one of his associates and say, "I think you are overstating."

3     He is not overstating anything today.

4          I have said that to the government from time to time.

5     They are not overstating today either.

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  So now the question is what do we do?  I

8     do believe and find that the offense level is accurately

9     stated in the report, and the offense level is 34, and the

10    Criminal History Category is I.

11         I do believe that the -- I don't believe it, I know

12    it to be true, that on Count 6, that is a mandatory

13    consecutive sentence of 84 months.  And on Count 6, that is

14    the easy job I have today.

15         It's Counts 1, 2, 4 and 5 that are not so easy.  And

16    it is the variance on the 3553(a) factors that I have to deal

17    with and discuss.

18         Other than this timeframe cut out of your life, your

19    character has been good.  It has been very good.  And the

20    history of your life has been equally as good.

21         I think it is a big issue.  I think 3553(a), that you

22    had what is, in my view, based on the reports I have before

23    me, without any question, you have a mental issue on the

24    bipolar status.

25         THE DEFENDANT:  Yes.

1          THE COURT:  I think it is also clear that it was

2     wholly untreated.

3          THE DEFENDANT:  Yes.

4          THE COURT:  And it is without debate that it is being

5     treated now, and that is a big issue, both the fact of its

6     existence, the fact that it is explainable.

7          It is not the same sort of thing as a drug addiction,

8     where everybody knows it, including the person who has it, and

9     they just either don't have the strength or the desire to deal

10    with it.  Mental illness is different from that.

11         And sometimes it takes an event like this,

12    specifically a criminal act, for it to come to the surface

13    where there is no denying it.

14         THE DEFENDANT:  Yes.

15         THE COURT:  And when there is no denial of it, there

16    must be a treatment.  Now, if a person refuses treatment, that

17    is a different, totally different situation, and in many ways,

18    that makes it easier for the Court.  But in your case, you are

19    treating it and you are treating it medically and, apparently,

20    from all sources, it is working.

21         The family support is unparalleled in this case.

22    Your community involvement, instead of stealing from the

23    community, it has been giving to the community for a lot more

24    years and decades than the aberrational conduct in this case.

25         The -- I don't think anybody who has lost a parent

1   can in any way act as though the loss of a parent is not an

2   enormous issue in somebody's life.

3           Now, most people, of course, losing a parent, do not

4   go off and commit a crime.  And that is not an independent

5   factor, but rather, it is a collective, one of many collective

6   factors that tends to explain, at least from a logical

7   standpoint -- not an explanation as far as an excuse or it is

8   not really a crime, that's not what we are talking about here,

9   we all know it is a crime and these are crimes, and they are

10  serious crimes.

11          But there is such a word that comes into play in the

12  English language based on what I'm seeing in your case, called

13  "synergism."  And very simply stated, it is where one plus one

14  equals five.  And, unfortunately, I think that the loss of

15  your mother during this period of time of other things -- but

16  again, having the foundation, in my view, the mental illness,

17  untreated mental illness -- that was another one of those

18  synergistic factors.

19          So that said, it appears to me as though the sentence

20  is going to be substantial, needs to be substantial for many

21  reasons.

22          One is because other people who commit such a crime

23  are oftentimes given many, many more years than you are going

24  to get.  That is not the only factor, because if that were the

25  only factor, that would completely discount, if not erode to

1  the point of nonexistence, the issue of untreated mental

2  illness, which I think is oftentimes unprovable, but in your

3  case, it seems to be provable circumstance.

4          But in addition to that, I do have to pay attention

5  to the victims.  And having a gun pulled on somebody strips

6  that person down to nothing.  Powerless, frightened, beyond

7  belief scarring, mental scarring, that doesn't just go away

8  because a person is captured or a person is charged or a

9  person is sentenced.

10         I can't help those people, but help them or not, I

11  know that they exist, and I know that for those people who had

12  guns pulled on them, they will never forget it, ever.

13         And having said that, having considered things such

14  as your age, having considered the point that your lawyer

15  discussed, which I completely agree with, and that is your

16  chances of recidivism are very, very low, in my view.

17         I can't say that about too many people who come

18  before this Court on serious matters and serious crimes,

19  because whether I mention it at sentencing or not, the feeling

20  I get for so many is that when they get out, they will be

21  back, committing crime.  And we do what we can to prevent

22  that, but we can't.  We can't, as a system, do that.

23         What does that much more are family support issues,

24  friendship issues.  And oftentimes, to gang members, when I

25  will be sentencing them, is I will say, "Turn around and point

1   out to me one gang member, one fellow gang member who is here

2   for you."  And they never can because they are never there.

3   Gang affiliation is only when things are going well, not when

4   they are going poorly.

5           But real friendship issues are much the opposite of

6   that, which is why, when you were giving your statement, you

7   could turn around and talk to, physically talk to people.

8   Because they are all here.

9           THE DEFENDANT:  Yes.

10          THE COURT:  They are not here because they have

11  nothing to do.  They are here because they think that what

12  they are doing today is more important than what they would

13  have been doing had you not committed these crimes.

14          Now, that's -- that should be an enormous statement

15  to you.  It is to me.

16          THE DEFENDANT:  Yes.

17          THE COURT:  So the Court finds that it is appropriate

18  to consider the 3553(a) factors.  And the Court believes that

19  the sufficiency issue of sentencing for the many factors that

20  the Court must look at and must respond to, that the 84

21  months, as I said, is consecutive, that's where we start.

22  That's a starting point.  There is nothing to talk about

23  there, that's statutory.

24          The Court finds as to Counts 1, 2, 4 and 5, that it

25  is appropriate, and the Court does sentence you on those two

1  concurrent sentences as to 1, 2, 4 and 5, although consecutive

2  as to 6, which is required by law, to 96 months, for a total

3  of 180 months.

4          I believe that we have to deal with the remaining

5  Count 3, do we not?

6          MS. ALSWORTH:  We do.  The government moves to

7  dismiss Count 3.

8          THE COURT:  All right.  That motion is granted, and

9  sentencing here is pursuant to the Sentencing Reform Act of

10  1984, and it is the judgment of the Court, as indicated, as I

11  have just said.

12          Was there a preliminary order of forfeiture?

13          MS. ALSWORTH:  There was.  It was filed on

14  January 22nd, and the government requests it be made final as

15  to the defendant and incorporated into the judgment.

16          THE COURT:  That request is granted.  Restitution is

17  in the amount of $113,500, payment to begin immediately.

18  Restitution is to be sent to the Clerk of the Court, who shall

19  forward it to the victims, as described in the Victim Impact

20  Section.

21          While incarcerated, payment of the restitution is due

22  during imprisonment at a rate of not less than $25 per

23  quarter, and payment you shall be through the Bureau of

24  Prisons Inmate Financial Responsibility Program.

25          Upon release from imprisonment, you shall be placed

1    on supervised release for a term of 60 months on Counts 1, 2,

2    4, 5, and 6, to be served concurrently for a total term of 60

3    months.

4          Within 72 hours of release from the custody of the

5    Bureau of Prisons, you shall report in person to Probation in

6    the District where you are released.

7          While on release, you shall not commit another

8    federal, state, or local crime; shall not possess a firearm,

9    ammunition or destructive device, as defined under 18 United

10   States Code 921, or any other dangerous weapon; shall not

11   illegally possess controlled substances; shall cooperate in

12   the collection of DNA, as directed by Probation; shall comply

13   with the standard conditions recommended by the Sentencing

14   Commission and adopted by the Court; shall refrain from any

15   unlawful use of a controlled substance; shall submit to one

16   drug test within 15 days of release from imprisonment, at

17   least two thereafter, not to exceed four per month.

18         The Court is going to order the nine special

19   conditions, which I can read or incorporate.

20         MR. KROGER:  Please incorporate.

21         MS. ALSWORTH:  Incorporate.

22         THE COURT:  Done and ordered.

23         Is there a geographical request here?

24         MR. KROGER:  Mendota as a first choice, Lompoc as a

25   second choice, and in the alternative, a California placement.

1          THE COURT:  The Court will make those recommendations

2     in the order requested as they accord with security

3     classification and space availability.

4          The Court does recommend participation in the

5     500-hour Bureau of Prisons substance abuse treatment program.

6          Appellate rights have been waived.

7          Is there anything else?

8          MR. KROGER:  No, your Honor, thank you.

9          MS. ALSWORTH:  No, your Honor.

10         THE COURT:  One last thing.  This time I want to

11    address the people who came.  You have no idea, although I

12    hope by my comments you have a few ideas, but probably not to

13    the extent that this Court views them, and that is your

14    appearance here was extraordinary, almost unprecedented, and

15    helpful.

16         Your letters, for those of you who wrote them, gave

17    me an opportunity to see who this person was and, apparently

18    since, is.

19         And I'm obviously taking the part of criminal

20    behavior out because I can figure that out all by myself,

21    based on the police reports, based on the Pretrial Presentence

22    Report and based on the charges.

23         I will just tell you that this could have been much,

24    much worse in many respects at the time of the crimes and at

25    the time of sentencing than it is.

1          And I will just tell you that there are some things

2     in life that cannot be fully explained, and this, frankly, is

3     one of them, this sort of behavior, and the dominos that start

4     falling as a result of it.

5          Countless lives are affected.  Countless lives,

6     frankly, are affected in a very, very negative way.  But

7     depending on what your friend and your relative, Mr. Torres,

8     does, will depend on what type of good comes out of this,

9     because no matter how bad something is, many, many good things

10    come out of bad things.  And I leave that up to him.  And I

11    think he knew that before he came in here.

12         And lastly, I will just tell you that within the

13    federal justice system, many people were very busy on this

14    case, starting with law enforcement, who investigated and that

15    ultimately led to the capture of Mr. Torres.  And thank

16    goodness that they were there doing their job because we don't

17    know how much worse this could have gotten.  We just know that

18    it would have been worse.

19         In addition then, beyond the law enforcement, we have

20    the United States Attorney's Office.  And you have done your

21    job and you have done your job very well.  And anybody who

22    thinks that she didn't is not seeing this clearly.

23         To the Presentence Report and Probation, I will tell

24    you that I met with the Probation Officer early, early this

25    morning, and for quite sometime, and she and I went over this.

1    And we didn't just go over facts, we went over, frankly, a

2    debate going back and forth on what should be done.

3          And it was not one being hard against the other, or

4    one taking a hard stance versus the other.  We were trying to

5    figure out what exactly was the best thing to do in this case.

6    And so she is to be commended as well.

7          And I can tell you from her comments, that this was

8    not an easy weekend for her.  She was not the only one not

9    thinking about things that would have been more pleasant to

10   think about, like family and friends.

11         So, all in all, this was a very difficult case.  And

12   I -- also, the United States Marshal's office, and the Court

13   security officers.  Everybody comes into play.

14         I know that from working as many years as I have with

15   my court reporter, and with the Clerk of the Court, who is

16   sitting here, they sit and listen to these things, and they

17   have human feelings about them too.

18         None of it is easy.  It is heart breaking to do this,

19   to see this.  So people have done their job.

20         Now it is your turn to do your job and we expect

21   that.

22         THE DEFENDANT:  Yes, yes.

23         THE COURT:  We will be in recess.

24         (The proceedings were concluded at 11:23 a.m.)

25

1         I, PEGGY J. CRAWFORD, Official Reporter, do hereby

2     certify the foregoing transcript as true and correct.

3

4  Dated:  3rd of August, 2016          /s/ Peggy J. Crawford
                                        PEGGY J. CRAWFORD, RDR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25